# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DEBORAH J. ECTOR,

    Plaintiff,

    vs.

JOHN E. POTTER,

    Defendant.

Case No. 1:08-cv-726

U.S. Magistrate Judge Timothy S. Black

**MEMORANDUM OF OPINION
AND ORDER
GRANTING SUMMARY JUDGMENT
TO DEFENDANT**

This employment discrimination case is before the Court on Defendant's motion for summary judgment (Docs. 19, 21), and the parties' responsive memoranda (Docs. 28, 30). The parties have consented to disposition by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (*See* Doc. 18.)

## BACKGROUND AND FACTS

Plaintiff, an African-American female, first joined the United States Postal Service in 1985. (Doc. 28, Ex. 1, Ector testimony, at 40.). Ms. Ector became a sales national account manager, or "NAM," in 1998. (*Id.*)[1] As a NAM, Ms. Ector's job was to work with the USPS's corporate clients in an effort to increase their purchases from the USPS. (Doc. 23, George Depo. at 9.) Each NAM was assigned a few corporate clients, or "accounts." In perform the sales work, NAMs would meet with decision-makers within each of the NAM's assigned accounts. (*Id.*)

---

[1] Subsequent to the filing of this case, the USPS engaged in a national reorganization. Ms. Ector now has a different job title and is subject to a different chain of command.

Prior to a major national sales reorganization in 2005 implemented by a Postal Service vice-president, NAMs had both service and sales related duties. (Doc. 21, Ex. A at 28). After this reorganization, NAMs were only responsible for sales, while an entity known as the "Business Service Network" ("BSN") became solely responsible for servicing accounts. (*Id*; Exhibit B, Roberts Declaration, at ¶ 2).

Ms. Ector's sales team included several other NAMs. (Doc. 21, Ex. A at 24-25). These NAMs were located in various locations including Cincinnati and Columbus, as well as Kentucky and Pennsylvania. (*Id*.) Her direct supervisor was Roberta Roberts, a Caucasian female. ("Ms. Roberts"). (Doc. 1 at ¶ 8). In 2005, her second line supervisor was African-American female, Sherl Streeter ("Ms. Streeter"). Ms. Streeter reported to Regional Manager, Brian Denneny, a Caucasian male ("Mr. Denneny"). (Doc. 1 at ¶ 8). After Ms. Streeter retired, an African-American male, Gene Hairston, filled her position.

In 2005, two significant events occurred.

First, Ms. Ector requested a temporary detail in Texas. (Doc. 21, Exh. B at ¶ 3). This was approved by management, and Ms. Ector spent approximately six months in Texas. (*Id*.). At the time of this detail, Ms. Ector had a sales portfolio consisting of clients in both Cleveland and Cincinnati. (Doc. 1 at ¶ 10). Her Cincinnati clients included Fidelity Investments ("Fidelity") and Lenscrafters. (Doc. 21, Ex. A at 31).

Second, the Vice President of the Postal Service instituted a major national reorganization of the Postal sales organization. (*Id*. at 28). Some sales accounts were moved from being serviced in one service area to another. One of these accounts involved Fidelity. Although Fidelity's corporate headquarters is in Boston, Fidelity has a

major operation in Northern Kentucky: a site Ms. Ector originally had in her portfolio. After the reorganization, the entire Fidelity account was assigned to Boston, rather than the sales area Ms. Ector's team serviced. (Doc. 21, Ex. B at ¶ 3). Some smaller accounts, including the Lenscrafter account, were assigned to sales staff employees who were not NAMs. (*Id.*)

After the reorganization and Ms. Ector's return from Texas, Ms. Ector was assigned a portfolio consisting of Cleveland clients, including Progressive Insurance ("Progressive"), National City Bank and Key Bank. (Doc. 21, Exh. A at 32). Ms. Streeter was the deciding official in this matter. (Doc. 21, Exh. A 144; Exh. B at ¶ 4). This re-assignment was completed by the fall of 2005. (Doc. 1 at ¶ 10).

In April, 2006, Ms. Ector and Ms. Roberts called on a customer of the Postal Service. (Doc. 21, Ex. A at 65-66). Ms. Ector claimed that Ms. Roberts caused the client's representative to feel ill at ease because Ms. Roberts questioned the representative extensively. After the meeting, Ms. Ector told Ms. Roberts that Ms. Roberts had both acted unprofessionally and dressed inappropriately for the meeting, specifically mentioning that Ms. Roberts' dress and two ankle bracelets were not professional. (*Id.*). Ms. Ector concedes that after this sales call and Ms. Ector's comments, Ms. Roberts' attitude toward her subordinate changed. (*Id.*, at 65-68). This incident took place before the occurrence of any of the issues complained of in Ms. Ector's EEO Complaint. (Doc. 21, Ex A. at Ex. 2.)

Post-reorganization, NAMs were evaluated mainly on two criteria: the amount of

increased revenue generated by their accounts, and the number of meetings they held with their customer's upper management. (Doc. 1 at ¶ 9). In the late fall of 2006, Ms. Ector complained that because all of her clients were in Cleveland, and she lived in Cincinnati, she could not engage in as many meetings as other NAMs who, in some cases, had client offices located in the same area in which the NAM lived. (Doc. 1 at ¶ 12). Even though some other NAMs did not have any accounts in their domiciles and others had to travel around the country, Ms. Ector noted that she was the only NAM who did not have any accounts within 120 miles or less from her home. (Doc. 21, Exh. A at 42-44).

In November of 2006, Ms. Ector approached Ms. Roberts about obtaining a national account in Cincinnati so she could more easily make her target numbers concerning meetings with upper level executives. She was told that no such accounts were available, and for her to be given an existing account, another NAM would have to lose the account. (Doc. 21, Exh. A at 80). Ms. Roberts later told Ms. Ector that Mr. Hastings, the NAM in Louisville, had been given the newly acquired Kroger account in order to complete his portfolio and because it was somewhat close to his home. (Doc. 21, Exh. B at ¶ 4). She explained that it would be inefficient for Mr. Hastings to be given a Cleveland account as it would require seven hours of driving and would mean both he and Ms. Ector would be traveling to Cleveland. (*Id.*). Ms. Roberts stated that another NAM had a Cincinnati account prior to the reorganization and that it would advantageous for that NAM to maintain that relationship. (*Id.*). In essence, there were no accounts available in Cincinnati that could have been transferred to Ms. Ector. (Doc. 21, Exh. A at

80).

In order to help Ms. Ector fulfill her executive meeting requirement for 2006, however, Ms. Roberts agreed to decrease the target number for Ms. Ector which meant that she could meet her annual target with fewer meetings. (Doc. 21, Ex. B at ¶ 9). For example, before this accommodation, if her goal was 150 meetings per year and she only had 100 meetings, she would have been rated as deficient. After the accommodation, if she had a goal of 100 meetings and actually held more than 100, she would be rated as exceeding her goal. (Doc. 21, Exh. A at 116-118).

In a telephone conference conducted on a speaker phone in November 2006, Ms. Roberts and Ms. Ector discussed a "Plan and Review" of Ms. Ector's accounts. (Doc. 1 at ¶ 14). The results of such discussions are not confidential and are accessible to other NAMs. (Doc. 21, Exhibit C, EEO Declaration of Welborn, at ¶ 2). Another manager, Mitzi Welborn, who is an African American, was in the office next to Ms. Roberts' office. (Doc. 21, Exh. C at ¶¶ 1-2). Ector complained that Ms. Roberts allowed Ms. Welborn to enter Ms. Roberts' office during this conversation. (Doc. 1 at ¶ 14; Exh. A at 61). However, Ms. Welborn testified that she never heard any discussion of a confidential nature or any heated discussions between Ms. Roberts and Ms. Ector. (Doc. 21, Exh. C at ¶ 3). On Friday, November 24, 2006, Ms. Ector received a call at her home in Cincinnati from an officer of one of her Cleveland accounts, Progressive. (Doc. 21, Ex. A at 47-49). Progressive employee Ed Pengl called to complain that a bulk mail shipment was rejected by the Manager of the Cleveland Bulk Mail Center (BMC) because

of too many errors in the mail shipment. (*Id*.; Ex. D, Declaration of Brian Denneny at ¶ 3). Ms. Ector conducted a conference call with Ed Pengl and BMC Manager David Young in an attempt to deal with this problem. (Doc. 21, Exh. A at 47-49).

Upon learning of the problem with Progressive, Brenda Rice, an African American manager with authority in the Cleveland Postal Service, sent an email to Mr. Denneny complaining of Ms. Ector's intrusion into the servicing of an account. (Doc. 21, Exh. D at ¶ 3.) Mr. Denneny sent Ms. Ector an e-mail two days later telling her she was not to engage in service activities and that in the future if one of accounts had a service issue, she should contact certain people in the chain of command in Cleveland who would handle the service issue. (Doc. 21, Exh. D at ¶ 4; Exh. A at 53, 56.) He also called Ms. Ector to discuss this matter on Monday, November 27, 2006. (Doc. 21, Exh. D at ¶ 4.) Ms. Ector claimed that this action interfered with her ability to do her job even though her job duties clearly were limited to sales. (Doc. 1 at ¶ 13). Ms. Ector conceded that she did not know if other NAMs violated the rules against servicing accounts. (Doc. 21, Exh. A at 60). Ms. Ector stated that she did not always comply with this instruction stating that "I had to do kind of like in a back door issue." (*Id.* at 55).

A few weeks after the November 24, 2006 incident, Ms. Roberts and Postal Manager Rick Urmson (who was responsible for service-related issues in Cleveland) held meetings with representatives of National City Bank, Progressive and Cleveland area Postal Management to deal with the issues that had been raised relating to the rejected bulk mail and other service related issues. (Doc 1. at ¶ 15, Exh. A at 73-75). Ms. Roberts

testified that these meetings were service-related and were designed to serve as "damage control" with these major clients of the Postal Service. (Doc. 21 Exh. B at ¶¶ 12-13). Mr. Denneny testified that such actions were a proper function of Managers Roberts and Urmson. (Doc. 21, Exh. D at ¶ 6).

Ms. Ector complained that these meetings were "bizarre." (Doc. 1 at ¶ 15). However, Ms. Ector did admit that Ms. Roberts had a vested interest in the Postal Service not losing Progressive as a client and that the incident involving the BMC and Progressive was not a routine event. (Doc. 21, Exh. A at 76-77).

At the end of 2006, Ms. Ector did not receive a bonus because of her performance. (Doc. 1 at ¶ 18). She was not alone. Three Caucasian NAMs also did not meet their goals and did not receive bonuses.[2] (Doc. 21, Exh. B at ¶ 23). Two other Caucasian male NAMs received bonuses even though they failed to meet all of their goals. (Doc. 1 at ¶ 18). However, those two had achieved significant success in other areas: one prevented over eight million dollars in revenue from being transferred to the United Parcel Service and the other created an additional 16 million in new business for the Postal Service. (Doc. 21, Exh. A at 84-85). Ms. Ector admitted that there was an objective basis for both of those bonuses.

On or about January 23, 2007, Ms. Ector's annual performance review was conducted by Ms. Roberts. (Doc. 21, Exh. A at 91, 107; Exh. D at ¶ 7). Mr. Denneny

---

[2] Three of the Caucasian male NAMs in Roberts' team have filed EEO actions against Ms. Roberts. Brad George, Bernard Hastings, and Jeff Miller have alleged that Ms. Roberts discriminated against them based on their race and/or color. Mr. George's EEO case (430-2009- 00034X) was terminated in the Postal Service's favor in a ruling granting summary judgment on or about June 12, 2009. (Doc. 21, Exhibit B at ¶ 25).

attended part of that review. (*Id*.). Ms. Ector was questioned about her accounts and she said that the Chief Executive Officer ("CEO") of Progressive Insurance had requested a later "pick up" time from the Postal Service. (*Id*.). Ms. Ector told her superiors that a later "pick up" would generate more revenue. (Doc. 21, Exh. A at 100-101). Both managers questioned her as to why the CEO of a major corporation would be so concerned about such a detail. (Doc. 21, Exh. A at 100-103; Exh. D at ¶ 7). She was also questioned about her failure to meet target numbers and revenue production. (Doc. 21, Exh. D at ¶ 7). Ms. Ector claimed that this private meeting constituted "ridicule" of her when she was questioned about her accounts and the fact that she was not making her target numbers. (Doc. 21, Exh. A. at 98). She also claimed that it was "unusual" for Mr. Denneny to sit in on her review when he did not do that with other NAMs. (Doc. 1 at ¶ 19).

Ms. Roberts testified that all of the NAMs were asked difficult questions by management. (Doc. 21, Exh. B at ¶¶ 16-20). She also noted that Ms. Ector was not subjected to any ridicule. (*Id*.). Mr. Denneny confirmed this assertion and noted that he asked other NAMs hard questions when they had problems with meeting their target numbers. (Doc. 21, Exh. D at ¶¶ 7-9). Mr. Denneny also testified that he actually attended the territory reviews of several other NAMs in his chain of command and that he spent two hours for each review for at least two other NAMs. (*Id*.).

In preparation for this review, Ms. Ector had gone to Kinkos to make presentation folders. (Doc. 21, Exh. A at 105-107). She testified that the Postal Service's

photocopiers were out of order, and she used her Postal Service credit card to pay for the copies. (Doc. 21, Ex. A at 109).

Although Postal Service rules required pre-approval for such expenditures, Ms. Ector admitted that she failed to obtain prior approval. (*Id*.). When she was questioned by Ms. Roberts concerning this expense, Ms. Ector claimed that this was more harassment. (Doc. 1 at ¶ 22). Ms. Roberts did not discipline Ms. Ector for this infraction and did not require Ms. Ector to reimburse the Postal Service for the unapproved use of the credit card. (Doc. 21, Exh. A at 110-111). Ms. Roberts testified that she also scrutinized other NAMs' expenditures. (Doc. 21, Exh. B at ¶ ¶ 21-22).

In late March 2007, Ms. Ector attended a National Postal Forum which was attended by major clients of the Postal Service as well as top Postal Management including the Postmaster General. (Doc. 1 at ¶ 24; Exh. A at 119-127). Ms. Ector complained that Mr. Denneny avoided her. (Doc. 1 at ¶ 24). However, Ms. Ector admitted Mr. Denneny's actions did nothing to hurt her in the eyes of her clients. (Doc. 21, Exh. A at 120-129). She also admitted that Postmaster General Potter, and other top officials, spoke to her and complimented her in front of her clients. (*Id*. at Exh. A at 120-127). Mr. Denneny testified that he was very busy at this forum, and Ms. Ector never made an effort to approach him. (Doc. 21, Exh. D at ¶ 10; Exh. A at 126). He also testified that he did not intentionally ignore her. (Doc. 21, Exh. D at ¶ 10).

In the spring of 2007, Ector contacted an EEO counselor. In April 2007, Mr. Denneny, and other Postal Service employees, were notified of an EEO investigation. (Doc.1 at ¶ 25; Exh. D at ¶ 11). Ms. Ector claims that Mr. Denneny told another

employee, Sarah Stubbs, that he had been contacted by an investigator. (*Id*.). Mr. Denneny concedes he may have told Ms. Stubbs about having to testify before an investigator, and that Ms. Stubbs was a close friend of his at the time. (Doc. 21, Exh. D at ¶ 11).

On or about February 27, 2007, Ms. Ector sought pre-complaint counseling. (Doc. 1, at ¶ 4). Her formal EEO Complaint was filed on June 8, 2007. (*Id*.). On June 21, 2007, Ms. Ector was issued an "Acceptance of Complaint" Letter ("Acceptance Letter"). (Doc. 21, Exh. A. at Exh. 2). This Acceptance Letter stated that the following issues are accepted for investigation:

> You alleged discrimination based on Race (African American), Color (Black) and Sex (Female) in that from November, 2006 through March 9, 2007, you have been subjected to a hostile work environment and ongoing harassment.

This letter contained a provision stating that if Ms. Ector did not agree with the defined accepted issues, she could file a written response. (*Id*.). She testified that she did not contest the accepted issues. (Doc. 21, Exh. A at 89). Issues concerning disparate treatment and retaliation are not mentioned in this letter. (Doc. 21, Exh. A at Exh. 2). During the course of the Administrative proceedings, the Administrative Law Judge allowed a retaliation claim to be added.

The ultimate decision was in favor of the Postal Service with the retaliation claim being dismissed with a one line note that Ector failed to prove such a claim.

Thereafter, Plaintiff initiated this action by filing a complaint pursuant to Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2, against the United States Postal Service

("Defendant"), alleging hostile work environment, racial discrimination, and retaliation.

## STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## DISCUSSION

Plaintiff claims three different types of discrimination: a racially hostile work environment, disparate treatment due to race, and retaliation based on her activity of filing an EEO Complaint in June 2007.

Defendant asserts that summary judgment should be granted because the Plaintiff cannot establish a *prima facie* case of hostile work environment -- or any other type of discrimination -- as there is no genuine issue of material fact that the incidents about which she complains were motivated by racial animus. Defendant further asserts that

even assuming that Ms. Ector could establish a *prima facie* case of racial discrimination, she cannot rebut, as pretext, the legitimate business reasons for the Postal Service's actions.[3]  Plaintiff maintains, however, that genuine issues of material fact predominate this controversy.

For the reasons that follow, the undersigned finds that Defendant's motion is well-taken.

## A.    Plaintiff's Hostile Work Environment Claim

Plaintiff claims that she was subjected to a hostile work environment based on her race in violation of Title VII.

To establish a *prima facie* case of a hostile work environment, Ms. Ector must establish the following: (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009).  Failure to establish a *prima facie* case is sufficient reason to grant the defendant summary judgment.  *Street v. J.C.*

---

[3]  Here, there is no direct evidence of racial discrimination, thus the burden-shifting approach outlined in several Supreme Court cases must be met by Ms. Ector to establish, initially, a *prima facie* case.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas v. Dept of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  If Ms. Ector can establish such a *prima facie* case, the burden is then shifted to the Federal Defendant to articulate a non-discriminatory reason for his actions. *EEOC v. Avery-Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997).  Once that has been established, the burden shifts back to the plaintiff to demonstrate that the articulated reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at  255-256; *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083-84 (6th Cir. 1994). If the plaintiff cannot demonstrate pretext, the defendant is entitled to summary judgment. *Coomer v. Bethesda Hospital, Inc.*, 370 F. 3d 499, 510-511 (6th Cir. 2004).

*Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

      **1.**    **Plaintiff has not established a *prima facie* case of Hostile Work Environment.**

Here, Plaintiff asserts that she was harassed on the basis of eight isolated incidents occurring between November 2006 and March 2007.  They include the following: (1) Ms. Roberts conducted a conversation with Ms. Ector on a speaker phone that may have been briefly interrupted by another manager; (2) Mr. Denneny told Ms. Ector to go through her chain-of-command if she wanted to contact Postal Service officials; (3) Ms. Roberts did not assign Ms. Ector an account in her district domicile; (4) Ms. Ector did not receive a year end bonus; (5) Ms. Roberts visited a Postal Service client without notifying Ms. Ector in advance; (6) During her performance review, Ms. Ector's supervisors questioned her about her failure to meet her goals and questioned her about her attempts to gain more business from Progressive; (7) Ms. Roberts made an inquiry regarding photocopy expenses Ms. Ector had incurred; and (8) At a National Postal Forum, Mr. Denneny avoided Ms. Ector.   Additionally, she also claims (although this is outside the time period designated in her EEO claim) that Mr. Denneny may have noted to another Postal Service employee that he had been notified to testify in Ector's EEO.

Defendant maintains that Plaintiff's allegations do not rise to a the level of a hostile work environment and the alleged harassment was not based race.[4]  Based on the

---

[4]  The undersigned agrees with Defendant's contention that the refusal to assign Ms. Ector the account she was requesting and the failure to award her a monetary bonus are more in the nature of employment actions, which more properly belong in an allegation of a disparate treatment claim as

foregoing, the undersigned agrees.

### i.      Plaintiff was not subjected to severe or pervasive conduct

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bowman v. Shawnee State University,* 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. *See Harris*, 510 U.S. at 21-22.

Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23.

Here, the undersigned has recently examined the Sixth Circuit precedent regarding severe and pervasive conduct and finds that the Sixth Circuit has repeatedly affirmed grants of summary judgment upon a determination that the conduct complained of was not sufficiently severe or pervasive as a matter of law.

---

opposed to a hostile work environment claim. Defendant further asserts that because these actions occurred in December 2006, and Plaintiff did not contact an EEO Counselor until February 27, 2007, they are untimely and should be dismissed. *Horton v. Potter*, 369 F.3d 906, 910 (6th Cir. 2004); 29 C.F.R. § 614.105(a)(1).

For example, in *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707 (6th Cir. 2007), the Sixth Circuit upheld the district court's determination that the harassment complained of by the plaintiff, which totaled 15 specific incidents over a two-year period, "did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work." 501 F .3d at 707. The court of appeals found instead that the incidents were for the most part "mere offensive utterances," which are not actionable under Title VII. *Id.* (citing *Harris*, 510 U.S. at 21). The court compared *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006), where the court deemed sufficiently severe and pervasive a ten-year course of conduct consisting of racial slurs, demeaning jokes, inflammatory graffiti, isolation and segregation, disparate discipline, and the imposition of additional duties, with *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000), where the court determined that three sexually offensive remarks made by the plaintiff's supervisor at the beginning and end of a six-month period did not constitute pervasive discriminatory conduct. *Id.*

In a number of other cases, the Sixth Circuit has upheld determinations by the district court that the conduct alleged by the plaintiff did not rise to the level of "severe and pervasive."[5] The conduct alleged in these cases in which the Sixth Circuit upheld

---

[5] These cases include *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir.2000), in which the court held that three of five alleged incidents, though "not merely crude, offensive, and humiliating, but also contain[ing] an element of physical invasion" were not sufficient to meet the severe or pervasive standard; *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000), where the court held that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period [did] not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment;" *Morris v. Oldham County Fiscal Court*, 201

dismissal is far, far, far worse (and different) than what is alleged here.

Likewise, in *Smith v. Glenny Glass Co., Inc.*, 2007 WL 1202713, *6-8 (S.D. Ohio April 20, 2007) (Dlott, J.), the now Chief District Judge of this Court held that seven instances of racially-oriented comments made by the president or other employees over an approximately five-year period, while "in incredibly poor taste and offensive," could not amount to severe or pervasive harassment under Sixth Circuit precedent. The court noted as examples of what is required for an employee to demonstrate a hostile or abusive work environment the incidents in *Allen v. Mich. Dept. of Corrections*, 165 F.3d 405, 408-09 (6th Cir. 1999), the incidents in *Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999), and the incidents in *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006). None of those three distinguished cases compare in any way to the facts alleged by Ms. Ector.

---

F.3d 784, 790 (6th Cir. 2000), where the court held that simple teasing, offhand comments, and isolated incidents, including a sexual advance, did not amount to discriminatory changes in the terms and conditions of the plaintiff's employment; *Dotson v. Norfolk Southern R.R. Co.*, 52 Fed.Appx. 655, 659 (6th Cir. 2002), where the court held that the following alleged conduct did not rise to the type regarded by the Sixth Circuit as severe or hostile; Smith v. *Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000), where the court held that "[r]acial animus [could not] be inferred from a handful of discriminatory comments by low-level employees; *Bourini v. Bridgestone/Firestone North American Tire, LLC*, 136 Fed.Appx. 747, 751 (6th Cir. 2005), where the court distinguished *Jackson v. Quanex*, 191 F.3d 647, 662 (6th Cir. 1999), and held that eight alleged incidents over a five-year period were insufficient to constitute discriminatory changes in the terms and conditions of employment, finding that while several of the incidents were offensive and highly inappropriate, they were relatively infrequent and isolated and collectively did not arise to the "threatening" or "humiliating" level of severe conduct required to create an objectively hostile or abusive work environment under Title VII); *Kelly v. Senior Centers*, 169 Fed. Appx. 423 (6th Cir.2006), where the court held that "we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of [plaintiff] was not ... [pervasive]" (distinguishing *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999), and *Pollard v. DuPont de Nemours, Inc.*, 412 F.3d 657, 659-664 (6th Cir. 2005), "where a relentless, daily, consistent pattern of ... harassment" was held to be sufficient to support a jury verdict of a hostile work environment).

Here, Defendants maintain that a reasonable person would not find the incidents related by Ms. Ector to be hostile, offensive or abusive, let alone racially hostile.  Rather, they are everyday managerial decisions and comments that reflect nothing more than the need for employee accountability.

Notably, Defendants assert that the incidents relied upon by Ms. Ector are supervisory in nature and do not constitute severe and pervasive harassment.  Ms. Roberts talking on a speaker phone, a supervisor telling an employee to contact upper management through a chain of command, a supervisor denying an employee's request for a specific account assigned to another employee, not giving a bonus to an employee who did not meet their goals, asking an employee about her accounts, pointing out deficiencies, warning an employee that she was not meeting her goals, and asking an employee a question about a travel expenses are all everyday workplace occurrences. The undersigned agrees that the incidents relied upon by Ms. Ector are not racially hostile and do not constitute severe and pervasive harassment.

Here, the record is totally devoid of any physical threats or racially-based epithets, jokes, remarks, or comments.  Taken together, the totality of the incidents Plaintiff describes is not racially hostile, nor threatening, nor severe, nor pervasive.

### ii.    Racially Motivated

Plaintiff maintains that she was treated differently than her similarly situated Caucasian peers, and the cause for the different treatment must be due to racism. Plaintiff's assertion lacks merit.

Plaintiff relies on the testimony of Brad George to establish the hostility of her work environment and that she was treated differently than other NAM's. George, a Caucasian NAM, testified that he believed Ms. Roberts is "a racist." (Doc. 23, George Depo. at 26). According to Mr. George, he came to this conclusion because he had the opportunity to observe Ms. Roberts interact with African-Americans and Ms. Roberts "act[ed] very uncomfortable" in the presence of African-Americans. Moreover, Mr. George "got the impression she felt like she didn't know how to properly talk to someone." (*Id.*)

However, Mr. George's beliefs, without more, are insufficient to establish that Plaintiff was subjected to a hostile work environment based on her race. As noted above, in order to satisfy her burden, Ms. Ector must "set forth specific evidence to show that the incident was not merely negative or motivated by dislike from a supervisor, but that it was motivated improperly by race." *Nicole v. Grafton School, Inc*., 181 F. Supp. 2d 475, 483 (D. Md. 2002). As noted by Defendants, none of the incidents cited by Ms. Ector are overtly racial in nature, and Ms. Ector has presented no specific facts beyond her own conclusory statements to establish that the incidents were based on race, or that she was treated less favorably than white or male employees. *See, e.g., Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998) (finding no indication that alleged incidents of harassment were based on race, where the alleged derogatory comments were not racial and the plaintiff could not show differential treatment of similarly situated employees); *Bowman,* 220 F.3d at 463 (several complained of actions in a sex-based hostile environment case

non-probative because the incidents were not based on Bowman's sex).

Here, the fact that Ms. Ector, an African-American, experienced conflicts with Caucasian supervisors, is insufficient to establish that these conflicts were based on race. *See Hawkins v. Pepsi Co,* Inc., 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races ... Instead, legally sufficient evidence is required to transform an ordinary conflict ... into an actionable claim of discrimination."). Thus, the evidence presented by Plaintiff is insufficient to show that the alleged incidents of harassment were based on race.

### 3. Pretext

Moreover, even assuming Plaintiff had established a *prima facie* case, her retaliation claim still fails as a matter of law because she cannot offer evidence that Defendan'ts legitimate, non-retaliatory reasons for its actions was pretext from some illegal motive.

In order to establish pretext, Plaintiff must demonstrate that the reasons given by Defendant for her discharge: (i) had no basis in fact, or (ii) did not actually motivate the decision, or (iii) were not sufficient to warrant the action taken. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A *prima facie* case, plus a showing that Defendant's articulated reason is false, would be sufficient for a plaintiff to prevail. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510 (1993); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997).

Upon careful review of the record, and in light of the holdings from the Sixth

Circuit cited above, the Court finds that Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact as to whether she was subjected to a racially hostile work environment.

### B.      Disparate Treatment Claim

Plaintiff's complaint also alleges a disparate treatment claim based on racial discrimination. Defendant maintains, however, that Plaintiff's disparate treatment claim of racial discrimination was not part of the issues accepted for investigation by the EEOC and is therefore barred for failure to exhaust the administrative remedies. *Brown v. General Services Administration*, 425 U.S 820, 832 (1976).

Defendant further maintains that because the two primary "adverse actions" complained of – the failure to receive a year-end bonus and the failure to give her a Cincinnati account – were not exhausted administratively, they fail as a matter of law. The bonus issue arose in December 2006, but Ms. Ector did not seek counseling until February 27, 2007, well beyond the 45 day period required. Similarly, the failure to award her an account that would require her supervisor to take the account away from another NAM occurred in November, 2006, and it was not timely grieved.

Plaintiff asserts, however, that her disparate impact claims are not time-barred given the recent amendment to Title VII. Earlier this year, in passing the "Lilly Ledbetter Act," Congress restored the enforcement provisions of Title VII to permit a plaintiff to bring a claim so long as she continues to experience the consequences of a discriminatory action, such as decreased wages. *See* 42 U.S.C. § 2000e-5(e)(3)(A). Thus, Plaintiff asserts that because her pay continues to be decreased due to a

wrongfully-denied end-of-year pay increase, her claim cannot be considered time barred. Finally, Plaintiff argues that this claim was properly administratively exhausted, as the claim appears in her "formal complaint" (Doc. 28, Ex. 5) and it was ruled upon by the administrative law judge. (Doc. 28, Bench Decision, Ex. 10 at 278-82).

Here, the recently passed statute cited by Plaintiff does not appear to be applicable and therefore does not change the exhaustion requirements that vested in early 2007.[6] Furthermore, Plaintiff does not provide any evidence or argument that the 45 day period should be equitably tolled. *Brown v. General Services Administration*, 425 U.S. 820 (1976).

In any event, even assuming Plaintiff's claim is timely, she has failed to establish a *prima facie* case of disparate treatment based on racial discrimination.

ii.     **Prima Facie Case**

In order to establish a *prima facie* case of disparate treatment based on racial discrimination, Ms. Ector must establish that: (1) She is a member of a protected class; (2)she was subjected to an adverse employment action; and (3) similarly situated employees not in the protected class were not subjected to such adverse actions. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). An adverse action is one that materially impacts upon the terms or conditions of one's employment. *Hollins*

---

[6] Additionally, there appears to be only one case that deals with the retroactive application of the "Lilly Ledbetter Act," a Fifth Circuit case, *Ganheart v. Xavier University of Louisiana*, No. 09–30094, Slip Copy, 2009 WL 2900776 (5th Cir. Sept. 10, 2009) which notes that this act is retroactive to May 28, 2007. All of the acts properly pled in Ector's complaint took place before May 28, 2007 and were not properly exhausted in that time.

*v. Atlantic Company, Inc.*, 188 F.3d 652, 662 (6th Cir. 1999).

Here, Plaintiff asserts that she was treated differently than her Caucasian counterparts in several incidents. These incidents include her annual review, her failure to receive a bonus, Ms. Roberts' meeting with her clients, and Mr. Denneny restricting her ability to engage in service-related matters. She thus claims she was the victim of race-based disparate treatment.

Notably, several of the actions involving Ms. Ector were also experienced Caucasian employees. These include the presence of Mr. Denneny at their annual reviews, not receiving an annual bonus, or being questioned about expenses. Mr. Denneny and Ms. Roberts testified that several other NAMs did not receive bonuses and were asked tough questions during reviews.

Ms. Ector specifically claims that all of her Caucasian counterparts received a monetary bonus after the close of Fiscal Year 2006. As noted by Defendants, her only support for this assertion is her EEO Complaint. However, as noted above, Ms. Roberts testified that three other NAMs did not receive a bonus. (Doc. 21, Ex. B at ¶ 23. Ms. Ector failed to supply any contradictory competent testimony from those NAMs. Her reliance on her EEO Complaint is improper for a party cannot merely rely on its pleadings to defeat a motion for summary judgment. *Cox vs. Kentucky Dept. of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995); Fed. Rule of Civ. Procedure 56(e)(2).

As to her claim that she was restricted in her dealings with service issues and that Ms. Roberts and another manager met with her clients, she can point to no similarly

situated NAM who caused Postal Service Management to contact Mr. Denneny and complain about the NAM's actions. As noted above, with respect to the issue surrounding the Cleveland Progressive account, Brenda Rice (an African American manager with authority in the Cleveland Postal Service) sent an email to Mr. Denneny complaining of Ms. Ector's intrusion into the servicing of an account. (Doc. 21, Ex. D at ¶ 3.)

Plaintiff further contends that she was treated differently than other NAM's because she was not assigned to an account in Cincinnati. However, as noted by Defendant, this assertion ignores the fact that some accounts required travel throughout the United States and for most NAM's to meet their target numbers for their complete ortfolio, extensive travel was normal. (Doc. 21, Ex. B at ¶¶ 8, 10; Doc. 25 at 43). Additionally, Plaintiff fails to note that her clients were all in one city while other NAMs had accounts in several different states meaning one trip could not be used to service their entire portfolio.

Moreover, the Declaration of Ms. Roberts contains a lengthy explanation of why Ms. Ector was assigned all of the Cleveland accounts and why she was not given an account in Cincinnati, and why the assignments, on the whole, created as many opportunities as those of her peers. (*See* Doc. 21, Ex. B, ¶ 4). Ms. Roberts states, *inter alia,* that after the realignment of Fidelity Investments, one of Plaintiff's Cincinnati accounts, was reassigned to a NAM in Boston, the location of Fidelity's national headquarter. (*Id.*). Additionally, Lenscrafters, another account in Cincinnati, was not

upgraded to the National Account Program and therefore was reassigned to a local Account Manager. (*Id*.).

Ms. Roberts also testified that other NAMs had extensive travel requirements including one NAM who constantly had to travel from Harrodsburg, Pennsylvania to Connecticut. (Doc. 21, Ex. B at ¶ 10). Ms. Roberts' explanation concerning Ms. Ector's assignment and opportunities was supported by other Postal Service Managers. (Doc. 28, Ex. 3 at 156-166).

Accordingly, the undersigned finds that Plaintiff has failed to establish facts that might evidence that she was treated differently than other similarly situated employees, and, therefore, she cannot satisfy the third prong of the *prima facie case* for disparate treatment.

### ii. Pretext

Moreover, even assuming Plaintiff had established a *prima facie* case, her disparate treatment claim still fails as a matter of law because she cannot offer evidence that Defendant's legitimate, non-retaliatory reasons for the adverse actions (detailed above) were pretext from some illegal motive.

In order to establish pretext, Plaintiff must demonstrate that the reasons proffered by Defendant: (i) had no basis in fact, or (ii) did not actually motivate the decision, or (iii) were not sufficient to warrant the action taken. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A *prima facie* case, plus a showing that Defendant's articulated reason is false, would be sufficient for a plaintiff to prevail. *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510 (1993); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997).

Purportedly as evidence of pretext, Plaintiff points to Mr. George's inference that Ms. Roberts is a racist and thus, Ms. Roberts' testimony is not credible and must be ignored or diminished. However, there is no testimony that Ms. Roberts uttered any statements that suggest any racist motivation. Rather, Mr. George felt that Ms. Roberts was "uncomfortable" around blacks and from that concluded that Ms. Roberts was a "racist." (Doc. 23 at 26). *See U.S. Ex. Rel. Diop v. Wayne County Community College Dist.*, 242 F.Supp.2d 497, 510-511 (E.D. Mich. 2003) (to establish direct evidence of discrimination, there must be evidence that a primary decision maker made remarks that must relate to the employment decision. A mere inference of racial bias is not sufficient).

Accordingly, Plaintiff is unsuccessful in proffering pretext, and the undersigned finds that Defendant is entitled to judgment as a matter of law with respect to Plaintiff's disparate treatment claim.

### C.    Retaliation

Plaintiff further alleges that Defendant unlawfully retaliated against her for filing an EEO complaint.

To proceed, Plaintiff must first establish a *prima facie* case of retaliation by showing the following: 1) she engaged in protected activity; 2) the exercise of her protected rights was known to the defendant; 3) the defendant subsequently took employment action against the plaintiff that a reasonable employee would have found

materially adverse; and 4) there exists a causal connection between the protected activity and the adverse employment action. *Hale v. Village of Madison*, 493 F. Supp. 2d 928, 938 (N.D. Ohio 2007).

Here, Defendant asserts that Plaintiff's complaint does not allege any adverse action after February 2007, when she contacted an EEO counselor. Plaintiff, however, asserts that the USPS engaged in two such actions. First, news of Ms. Ector's filing of a charge of discrimination was leaked to employees with no connection to the case. Specifically, Mr. Denney confided in Ms. Stubbs that he had to travel to Cincinnati to testify in the EEO action. Second, Ms. Ector was approached by Mr. Hairston, a high-ranking member of management, and told that "someone" had sent him to tell her to drop the case.

As noted above, an adverse action is one that materially impacts upon the terms or conditions of one's employment. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Plaintiff assertions fail to meet that standard.

The undersigned agrees with Defendant that Plaintiff's assertion that a reasonable person would be deterred from pursuing EEO rights because one additional employee learned of her action is clearly unreasonable and does not approach the sort of retaliatory actions deemed sufficient by the Sixth Circuit. *Id.* The same is true with Mr. Hairston merely requesting that she drop her charges. She suffered no threats from Mr. Hairston. (Doc. 28, Ex. 3 at 197-199). Mr. Hairston's extensive testimony concerning this matter demonstrates that he approached her as a friend and that he put no pressure on her. Ms.

Ector also does not claim that any other member of the Postal Service threatened her. She suffered no diminution of job duties, loss of pay, loss of vacation, nor the imposition of more strenuous work as a result of filing her EEO action. Indeed, a reasonable person would not deem such actions as rising even to the level of "petty slights" or "minor annoyances." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir.2000) (Employment actions that are *de minimis* are not actionable under Title VII); *see also Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999) ("If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure.")

More importantly, Ms. Ector, when questioned about what adverse employment actions she suffered as a result of her EEO activity, could supply absolutely no relevant conduct. (Doc 21, Exh. A at 140).

Accordingly, the undersigned finds that Plaintiff has failed to establish that she suffered an adverse action and therefore cannot establish a *prima facie* case of retaliation.

**CONCLUSION**

Wherefore, based on the evidence of record, the Court finds that there are no genuine issues of material fact for trial, and that Defendant is entitled to judgment as a matter of law.  Accordingly, Defendant's motion for summary judgment is **GRANTED,** and this case is **CLOSED**.


Date:<u>April 5, 2010</u>                           <u>  s/Timothy S. Black          </u>
                                                    Timothy S. Black
                                                    United States Magistrate Judge